JACOB LEQVE, Assignee, v. FRANZ JOSEPH STOPPEL and Others.[1]

February 7, 1896.

Nos. 9655—(293).

**Fraudulent Conveyance—Sufficiency of Consideration—Bona Fides.**

*Held,* in an action brought to set aside, as a fraud upon creditors, certain conveyances and transfers of real and personal property by a father to his sons, that certain findings of fact—in effect, that the conveyances and transfers were made in pursuance of a previously made and valid oral agreement, in good faith, and without any intent to hinder, delay, or defraud the father's creditors—were supported by the evidence, and justified the conclusions of law.

[1] Reported in 66 N. W. 124.

Appeal by plaintiff from an order of the district court for Olmsted county, Buckham, J., denying a motion for a new trial. Affirmed.

*Chas. C. Willson*, for appellant.

*Geo. W. Granger* and *Brown & Abbott*, for respondents.

COLLINS, J. This was an action to have certain deeds, transfers, sales, and mortgages of the property, real and personal, of defendant Franz Joseph Stoppel, an insolvent, adjudged fraudulent and void as to his creditors, and the property recovered and marshaled as part of his estate, the plaintiff being his assignee in insolvency. On the findings of fact made by the court below, judgment was ordered in favor of all defendants. This appeal is from an order denying plaintiff's motion for a new trial of the issues made with the defendants Stoppel only; no question being raised as to the correctness of the findings with reference to defendant Coon, who was mortgagee of a part of the real estate, and Union National Bank, a judgment creditor of the copartnership hereinafter mentioned.

The deeds, sales, and transfers attacked by the complainant were dated and made on April 14, 1890. Defendant Franz Joseph Stoppel was then about 78 years of age, a farmer, and the father of defendants Charles, William, and Frank Stoppel. In May, 1889, he had entered into a partnership with five other persons—all farmers—for the purpose of operating a creamery at Rochester, Minnesota, with such outlying or "skimming" stations as might be found necessary; and the business was being carried on, and was about to be extended, April 14, 1890. He had owned for many years a farm of 388 acres, valued at $11,000, including his homestead of 80 acres, valued at $3,500. His personal property at and about the farm was worth $1,400, and although it is asserted by counsel that, of this, articles of the value of $533 were exempt, we find no evidence, and there was no finding by the trial court, to justify the claim. Several years prior to the date last mentioned the real estate had been mortgaged to secure the payment of $7,000. At this time—April 14, 1890—his wife was living, and there were five sons and two daughters. Three of his sons had always lived with him

upon the farm, and were then aged as follows: Charles, 33 years; William, 30 years; and Frank, 28 years.

Some years before the formation of the partnership the father had orally agreed with these three sons that if they would remain at home after they severally became of age and work the farm,— help to carry it on and to pay off this mortgage of $7,000,—he would, when it was fully paid, convey all of the real estate and turn over all of his personal property to them. These three sons remained at home,—carried on the farm,—one for about 12 years, another some 9 years, and the third about 7 years; and the incumbrance was fully paid off some time in January, 1890, and the father then announced that he was ready to fulfill the agreement in respect to his property. April 14, 1890, he and his wife executed and delivered deeds whereby all of the real estate was conveyed to the sons in parcels, and according to a division agreed upon by them. The personal property was also turned over to them. The deeds were recorded on the same day. The sons have since had possession of their respective tracts or farms, and of the personal property, and have made valuable improvements on the land. As a part of the transaction of April 14, Charles and Frank Stoppel agreed orally with their father and mother that they would pay to the latter, or to the survivor, in case one should die, the sum of $1,500, in semiannual instalments of $75, commencing April 1, 1891, and would furnish them, so long as either should live, two living rooms in the house then on the homestead, or in a separate house, all provisions, except groceries, needed by them, all fuel and necessary aid and assistance in sickness. These two sons also agreed to pay to a sister $500 by April 1, 1892; to another sister, $300, by April 1, 1893; and to a brother, John, $100, at the same time. December 31, 1890, this agreement was duly reduced to writing, signed and acknowledged by the parties, in which writing it was stipulated that all of the promises therein contained should be a lien and charge on the land theretofore conveyed to Charles and Frank.

The appellant challenges, by his assignments of error, those findings of fact by which it was found that on April 14, 1890, the copartnership was solvent, and that the father and his sons and the Union Bank believed it to be solvent, and that it would continue so, and have assets enough to pay all liabilities; and the finding

that the father made a valid oral contract with his three sons to convey to them his real and personal property, if they would remain at home, as before stated; and also the finding that the conveyances of the real property and the transfer of the personalty to the sons were made in good faith, and without any intent to hinder, delay, or defraud creditors. The other assignments are directed to the conclusions of law, and it seems to be admitted, in ·effect, that, if all of the material findings of fact are supported by the evidence, the conclusions of law are correct.

1. There seems to be an abundance of evidence upon which to rest the finding that the copartnership was solvent on April 14, 1890. It had been a going concern for about one year; was in a prosperous condition,—about to extend its operations; was indebted about $3,000, and of this over $500 was due to defendant Franz Joseph Stoppel; and its reputation for solvency was first-class. Its assets were largely in excess of its liabilities, and, of the debts before mentioned, a large part was thereafter paid in due course of business. The credit of the concern at the Union Bank was then good, for the bank had already loaned money to it, and continued so to do for more than one year afterwards. After April 14, two or three responsible members of the firm sold out to their associates, and were formally released by the bank from all liability on the partnership notes then held by it. After that time defendants Charles and Frank Stoppel loaned money to the firm to the amount of $1,900, while the latter indorsed its notes in a sum exceeding $6,000. The firm and its then members did not assign until November 16, 1893,—about 2½ years after the transactions now assailed were had,—and up to the time of the assignment the partnership seems to have been doing business. It would seem that the father and the sons and the bank were fully warranted in considering the firm solvent on the day in question, and for some months afterwards, and well able to liquidate its obligations as they matured.

2. There was also an abundance of proof to support the finding that Franz Joseph Stoppel made the oral agreement with his three sons as claimed by them.

Not only did they testify to it, but all of the circumstances tend to corroborate and establish their statements. Such contracts are a very common thing among people of his nationality. When

Charles became of age, his father must have been about 65 years old, and he was not far from 70 when the youngest of the three attained his majority. In his declining years, at an age when most men are past their years of usefulness, he found his farm incumbered by a mortgage of $7,000. Burdened with this large indebtedness, the prospect for the sons, in so far as the farm was concerned, could not have been very flattering, even with the offer in question, and without their assistance the outlook for the father must have been very discouraging. There were other children,—four in number,—and, should these three boys remain at home after becoming of age, there was no assurance that their efforts to cancel the debt would be of any more benefit to them than to the children who had gone or would go out for themselves. What more natural, under these circumstances, than that the arrangement and agreement claimed should have been entered into? Again, these three sons remained at home after becoming of age,—one for 12 years, another for 9 years, and the youngest for 7 years, prior to 1890,—all working for the one object of freeing the farm of a very large incumbrance. When we find so uncommon and unexpected an occurrence, we ought not to be surprised when informed that there was an agreement, of many years' standing, that the sons were to be rewarded in the manner alleged in this case. In fact, we should be surprised if told that no arrangement or agreement had been entered into whereby the latter were to be compensated for their years of hard work.

3. The important finding that the transfers and conveyances were made in good faith, and without any intent to hinder, delay, or defraud the father's creditors, is also well supported by the evidence.

We have referred at length to the facts which preceded the making of the deeds and the actual transfer of the property, on April 14, 1890, and the matters which actually furnished the consideration therefor. The good faith of the transaction, and the intent of the parties, are to be determined from all of the circumstances,—starting out with the ascertained fact that an oral agreement had been entered into, years before, to do just what was done, except that it was understood that the property was to be transferred and conveyed without conditions; that the sons had worked faithfully year after year upon the farm, so that it might be free of the in-

cumbrance; that their work and labor were worth, at a fair price, all that they received for it; that their efforts to pay off the debt had been crowned with success about three months before the deeds and transfers were made; and that these instruments were executed and delivered as soon thereafter as was convenient. Let us look at the circumstances as they seem to have existed April 14, 1890.

At that time Franz Joseph Stoppel had no individual creditors. The firm of which he was a member owed for machinery, and for money borrowed from defendant bank with which to pay for machinery, and it owed Stoppel $527; but its assets exceeded in value, by quite a sum, the amount of its liabilities, and it was doing a flourishing business. No person, either in or out of the concern, had reason to suppose that it would become insolvent, and it did not make an assignment for $2\frac{1}{2}$ years afterwards. Its credit and standing were such that two of the sons loaned it money, and one indorsed its notes, long after the day of which we speak. Nor did Stoppel convey and dispose of all of his property except such as was beyond the reach of his creditors under the exemption laws of the state,—a thing frequently done by embarrassed debtors. He transferred a valuable homestead and all of his exempt personal property,—a wholly unnecessary act, if he designed a fraud upon his creditors. He reserved his interest in the partnership business, which was then regarded as of some value, and subsequently he added to this interest as other parties retired. He also retained the debt of $527 due to him from the firm, and regarded as perfectly good. It was also stipulated that two of his sons should pay him $1,500, in semiannual instalments of $75, and this agreement was reduced to writing in December, following.

It is far from being a case where a debtor, insolvent, or in anticipation of being insolvent, conveys that part of his property which is subject to seizure upon execution, and, as to the balance, relies upon, and is protected by, our exemption laws. Nor is it a case where concealment indicates a bad motive. The deeds were put upon record on the day of their execution and delivery, and the grantees took immediate possession. The agreement, reduced to writing December 31, 1890, that two of the sons should furnish their parents with two living rooms and various articles, and should

pay them $1,500, in semiannual instalments of $75, was also recorded within three days after it was signed. It was also shown that as early as December, 1890, the cashier of defendant bank was personally informed by one of the sons of what had been done. The whole affair was conducted openly and above board, in every detail. There was a valid and adequate consideration. There was no evidence of a fraudulent intent, but, to the contrary, the proofs well establish the bona fides of the transaction. We need not refer particularly to the rules of law which are applicable here, and which justified the conclusion of the court below. Several are stated in the recent case of Wetherill v. Canney, 62 Minn. 341, 64 N. W. 818. See, also, Dunlap v. Hawkins, 59 N. Y. 342; Neuberger v. Keim, 134 N. Y. 35, 31 N. E. 268; Davis v. Howard, 73 Hun, 347, 26 N. Y. Supp. 194; Howard v. Rynearson, 50 Mich. 307, 15 N. W. 486; Ware v. Purdy (Iowa) 60 N. W. 526.

4. It is urged by counsel for plaintiff that, if the deeds and transfers cannot be declared fraudulent as to creditors, his client is at least entitled to have them so held as to such parts of the purchase price as were provided for in the agreement made by two of the sons on December 31, 1890, and remained unpaid when this action was brought. The beneficiaries of that agreement, which was really an afterthought, and wholly gratuitous, were the father, the mother, two sisters, and a brother. There are several reasons why the claim of counsel is without merit, but it can be disposed of by saying that neither of the sisters are parties herein, nor is the brother, and that there is no finding on which to base an order for the partial relief asked by counsel.

Order affirmed.